**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| 1325 ATLANTIC REALTY LLC | : | Case No. 22-40277 (NHL) |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------x

## FIRST AMENDED PLAN OF LIQUIDATION
## <u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Tracy L. Klestadt
Christopher Reilly

*Counsel to the Debtor and Debtor in*
*Possession*

Dated: New York, New York
         May 17, 2023

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARTICLE 1 – DEFINITIONS AND RULES OF INTERPRETATION ........................... 1

      A. Definitions ......................................................................................... 1

      B. Rules of Interpretation.......................................................................... 8

      C.. BHG Settlement Agreement.................................................................. 9

      D. Representative of Debtor Post-Confirmation........................................... 9

ARTICLE 2 – PAYMENT OF CLAIMS NOT REQUIRED TO BE CLASSIFIED ....... 9

    2.1. Claims Not Classified ........................................................................ 9

      (a) Administrative Expense Claims ........................................................... 9

      (b) Priority Tax Claims ....................................................................... 9-10

      (c) Property Tax Claims......................................................................... 10

      (d) Professional Fee Claims ................................................................... 10

ARTICLE 3 – CLASSIFICATION OF CLAIMS ........................................................ 10

    3.1. Criterion of Class ........................................................................... 10

    3.2. Class Categories ............................................................................. 10

ARTICLE 4 – TREATMENT OF CLASSES OF CLAIMS ........................................... 11

    (a) Class 1 (Mechanic's Lien Claims) ..................................................... 11

    (b) Class 2 (General Unsecured Claims) ................................................... 11

    (c) Class  3 (Equity Interests).................................................................. 11

ARTICLE 5 – MEANS OF IMPLEMENTATION OF THE PLAN ............................... 11

    5.1. Plan Funding ................................................................................. 11

    5.2. Approval of Sale and Purchase Agreement ........................................... 12

5.3. Establishment of Reserves and Funds............................................................... 13

    (a) Administrative Reserve ...................................................................... 13

    (b) Disputed Claim Reserves .................................................................. 13

5.4. Preservation of Causes of Action ................................................................... 13

5.5. Disposition of Records........................................................................................ 14

5.6. General Disposition of Assets........................................................................... 14

5.7. Administrative Expense Claims Bar Date ..................................................... 14

5.8. Deadline for Filing Applications Seeking Payment of Professional Fee
Claims .......................................................................................................................... 14

5.9. Execution of Documents to Effectuate Plan ............................................. 14-15

5.10. Dissolution Upon Closing of the Case ......................................................... 15

5.11. Post-Confirmation Reports and Fees ........................................................... 15

5.12. Insurance Preservation ..................................................................................... 15

ARTICLE 6 – TREATMENT OF EXECUTORY CONTRACTS & UNEXPIRED
    LEASES..................................................................................................................... 15

6.1. General Provisions ............................................................................................... 15

6.2. Notice of Deemed Rejection/Rejection Bar Date ......................................... 16

ARTICLE 7 – CONDITIONS PRECEDENT .................................................................. 16

7.1. Conditions Precedent to Confirmation of the Plan ....................................... 16

7.2. Conditions Precedent to the Effective Date ................................................... 16

7.3. Waiver of Conditions Precedent ............................................................... 16-17

ARTICLE 8 – INJUNCTIONS; RELEASE; EXCULPATION ....................................... 17

8.1. General Injunctions ............................................................................................. 17

(a) Injunctions against Interference with Consummation or
Implementation of Plan ............................................................................... 17

(b) Plan Injunction ....................................................................................... 17

8.2. Exculpations ................................................................................................ 17

8.3. No Bar to Claims Against Third Parties ....................................................... 18

8.4. All Distributions Received in Full and Final Satisfaction ............................ 18

8.5. No Modification of Res Judicata Effect ....................................................... 18

8.6. No Discharge ............................................................................................... 18

ARTICLE 9 – PROVISIONS GOVERNING DISTRIBUTIONS ................................. 18

9.1. Generally .................................................................................................... 18

9.2. Indefeasibility of Distributions .................................................................... 18

9.3. Frequency of Distributions .......................................................................... 18

9.4. Payment in U.S. Dollars ............................................................................... 18

9.5. Claims in U.S. Dollars ................................................................................. 19

9.6. Distributions Only on Business Days ........................................................... 19

9.7. Transmittal of Payments and Notices .......................................................... 19

9.8. Record Date for Distributions ...................................................................... 19

9.9. Unclaimed Distributions .............................................................................. 20

9.10. No Payments of Fractional Cents or Distributions of Less Than Two
Hundred Dollars ................................................................................................. 20

9.11. Setoff and Recoupment .............................................................................. 20

9.12. Payment of Taxes on Distributions Received Pursuant to the Plan ............ 20

9.13. Compliance with Tax Withholding and Reporting Requirements ............... 21

9.14. Disputed Distribution ................................................................................. 21

9.15. Claims Administration Responsibility ........................................................ 21

    (a) Reservation of Rights ........................................................................ 21

    (b) Objections to Claims ......................................................................... 22

    (c) Filing Objections .............................................................................. 22

    (d) Determination of Claims ................................................................... 22

9.16. Disallowance of Claims without Further Order of the Court ...................... 22

9.17. Disputed Claims ........................................................................................ 22

9.18. Limitations on Funding of Disputed Claims Reserve ................................ 23

9.19. Timing of Distributions on Disputed Claims Subsequently Allowed ... 23-24

9.20. No Payment or Distribution on Disputed Claims ....................................... 24

ARTICLE 10 – PLAN INTERPRETATION, CONFIRMATION AND VOTING ....... 24

10.1. Procedures Regarding Objections to Designation of Classes as Impaired or Unimpaired ...................................................................................................... 24

10.2. Withdrawal and Modification of Plan ......................................................... 24

10.3. Governing Law ......................................................................................... 24

10.4. Voting of Claims ................................................................................... 24-25

10.5. Acceptance by Impaired Class .................................................................. 25

10.6. Cram Down ............................................................................................... 25

ARTICLE 11 – RETENTION OF JURISDICTION BY BANKRUPTCY COURT ...... 25

ARTICLE 12 – MISCELLANEOUS PROVISIONS ..................................................... 26

12.1. Headings ................................................................................................... 26

12.2. No Attorneys' Fees ................................................................................... 26

12.3. Notices ...................................................................................................... 26

12.4. Binding Effect ........................................................................................... 26

# INTRODUCTION

1325 Atlantic Realty LLC, the above captioned debtor proposes this plan of liquidation pursuant to section 1121 of the Bankruptcy Code. This Plan contemplates the (i) approval and eventual closing of the sale of the Property, located in Brooklyn, New York, which is the only asset of this Estate and (ii) the distribution of proceeds of such sale in accordance with the agreement reached between the Debtor, the BHG Claimants, and GFNP (as each term is defined herein).

## ARTICLE 1 - DEFINITIONS AND RULES OF INTERPRETATION

### A.    Definitions.

The following terms, when used in this Plan, or any subsequent amendments or modifications thereof, shall have the respective meanings hereinafter set forth and shall be equally applicable to the singular and plural of terms defined.

**1.1**    "Administrative Expense Claim" means a Claim for costs and expenses of administration Allowed under sections 503(b) and 507(a)(2) including, without limitation, (a) any actual, necessary costs and expenses of preserving the Estate and winding down the Debtor's operations during the Case, (b) any indebtedness or obligations incurred or assumed by the Debtor in the ordinary course of business in connection with the wind-down of its operations during the Case, (c) any Professional Fee Claims, whether fixed before or after the Effective Date, (d) any costs and expenses for the management, maintenance, preservation, sale, or other disposition of any Assets incurred during the Case, and (e) any fees or charges assessed against the Debtor's Estate under 28 U.S.C. § 1930.

**1.2**    "Administrative Expense Claims Bar Date" shall have the meaning set forth in Section 5.8 of the Plan.

**1.3**    "Administrative Reserve" means the reserve of funds established by the Debtor as provided in Section 5.3 hereof to fund post-confirmation costs in order to complete the wind-down of the Debtor's Estate, which shall be funded by the proceeds of the Property Sale remaining after satisfaction of all Allowed Claims.

**1.4**    "Allowed" means, when referring to a Claim, a Claim against the Debtor (i) proof of which was originally filed within the applicable period of limitation fixed by the Bankruptcy Court in accordance with Rule 3003(c)(3) of the Bankruptcy Rules and as to which as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, a Final Order, or the Claims Objection Bar Date, or as to which an objection has been interposed and such Claim or Interest has been allowed in whole or in part by a Final Order, or (ii) a Claim which has been or hereafter is listed by the Debtor in its Schedules as liquidated in an amount and not disputed or contingent, or (iii) a claim or Interest that is allowed by this Plan or Final Order of the Bankruptcy Court. For purposes hereof, an "Allowed Claim" shall include any Claim arising from the recovery of

property under sections 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code, provided, however, that (i) a Claim allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered an "Allowed" Claim hereunder unless otherwise specified herein or by order of the Bankruptcy Court, (ii) an "Allowed" Claim shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, unless otherwise specifically provided for in the Plan; and (iii) an "Allowed" Claim shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

**1.5** "Assets" means any and all property of the Estate, including without limitation all property and other interests identified in section 541(a) of the Bankruptcy Code. Without limiting the foregoing, Assets shall include all of the Debtor's real, personal, tangible and intangible property, wherever located and whether acquired prior to or after the Petition Date, including Cash, real property, personal property, furniture, fixtures, equipment, artwork, intellectual property, accounts, tangibles, intangibles, Causes of Action (including Avoidance Actions), together with the proceeds and products, replacements and accessions thereof.

**1.6** "Avoidance Action" means any Causes of Action to avoid or recover a transfer of property of the Estate or an interest of the Debtor in property, including, without limitation, actions arising under sections 506, 510, 541, 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other applicable federal, state or common law.

**1.7** "Bankruptcy Code" means title 11 of the United States Code, as amended, in effect and applicable to the Case.

**1.8** "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Eastern District of New York wherein the Case is pending.

**1.9** "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States, as amended, and any Local Rules of the Bankruptcy Court, as amended, in effect and applicable to the Debtor's Case.

**1.10** "Bar Date" means June 15, 2022 unless the Court has set a different date by which a specific Creditor must file a proof of Claim, in which case it means, for such specific Creditor, such different date set by the Court.

**1.11** "BHG" means Brooklyn Hospitality Group LLC.

**1.12** "BHG Claimants" means, collectively, BHG, W. Developers Group and Lazar Waldman.

**1.13**    "BHG Settlement Agreement" means the settlement agreement dated as of May 11, 2023, by and between the Debtor, GFNP, BHG, W. Development Corp., and Lazar Waldman, wherein the parties thereto resolved the various claims held against each other and agreed to sell the Property, a copy of which is annexed hereto as Exhibit A.

**1.14**    "Business Day" means any day other than a Saturday, Sunday or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

**1.15**    "Buyer" shall mean Lazer Waldman, the purchaser of the Debtor's Fee Interest in the Property, subject to the Leasehold Interest.

**1.16**    "Cash" means legal tender of the United States of America.

**1.17**    "Causes of Action" means any and all Claims, rights, actions, chose in action, suits, and causes of action belonging to the Debtor or its Estate and any and all liabilities, obligations, covenants, undertakings and debts owing to the Estate, whether arising prior to or after the Petition Date, and in each case whether known or unknown, in law, equity or otherwise, including Avoidance Actions.

**1.18**    "Case" means the case concerning the Debtor, commenced voluntarily on February 16, 2022, under chapter 11 of the Bankruptcy Code, administered under case number 22-40277 (NHL) in the Bankruptcy Court.

**1.19**    "Claim" means, as defined in Bankruptcy Code section 101(5): (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.20**    "Claim Transfer Document" shall have the meaning set forth in Section 9.8 of this Plan.

**1.21**    "Claims Objection Bar Date" means, unless otherwise extended by Order of the Court, the first Business Day that is 180 days after the Effective Date.

**1.22**    "Class" means a category of Claims described in Article 3 of the Plan.

**1.23**    "Collateral" means any property or interest in property of the Estate of the Debtor subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**1.24**    "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

**1.25** "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as the Plan may be amended by its terms and consistent with applicable law, and any findings of fact and conclusions of law contained in the Confirmation Order or a separate document entered substantially contemporaneously therewith.

**1.26** "<u>Creditor</u>" means any Person holding a Claim against the Debtor or, pursuant to section 102(2) of the Bankruptcy Code, against property of the Debtor, that arose or is deemed to have arisen on or prior to the Petition Date, including, without limitation, a Claim against the Debtor of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

**1.27** "<u>Debtor</u>" means 1325 Atlantic Realty LLC, the debtor and debtor-in-possession in Chapter 11 Case No.: 22-40277 (NHL) in the United States Bankruptcy Court for the Eastern District of New York.

**1.28** "<u>Disallowed</u>" means, when referring to a Claim, a Claim (including a Scheduled Claim), or any portion of a Claim, which has been disallowed or expunged by a Final Order.

**1.29** "<u>Disclosure Statement</u>" means the disclosure statement for the Plan, and all exhibits annexed thereto or otherwise filed in connection therewith, approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code.

**1.30** "<u>Disclosure Statement Approval Order</u>" means the Order of the Bankruptcy Court conditionally approving the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code.

**1.31** "<u>Disputed</u>" means, with respect to a Claim against the Debtor, the extent to which the allowance of such Claim is the subject of a timely objection, complaint or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn with prejudice, or determined by a Final Order.

**1.32** "<u>Disputed Claims Reserve</u>" means the segregated accounts established by the Debtor, as necessary, consistent with Article 9.17 of the Plan.

**1.33** "<u>Distribution</u>" means any distribution made pursuant to the terms of this Plan.

**1.34** "<u>Distribution Agent</u>" means the Debtor or such other third party agent engaged by the Debtor to make Distributions under the Plan.

**1.35** "<u>Distribution Date</u>" means any date on which a Distribution is made to Holders of Allowed Claims under this Plan. The first Distribution shall occur as soon as practicable on or after the Effective Date.

**1.36** "<u>Distribution Record Date</u>" shall have the meaning set forth in Section 9.8 of this Plan

**1.37** "<u>Effective Date</u>" means the earlier of (a) the first Business Day after the entry of the Confirmation Order that (i) the Closing (as defined in the Sale and Purchase Agreement) of the Property Sale shall have occurred, and (ii) the effectiveness of the Confirmation Order has not been stayed, or (b) such other date following the Confirmation Date that the Debtor designates.

**1.38** "<u>Estate</u>" means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code upon the Petition Date.

**1.39** "<u>Fee Interest</u>" shall mean the fee title to the Property.

**1.40** "<u>Fee Application Deadline</u>" shall have the meaning set forth in Section 5.9 of the Plan.

**1.41** "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; <u>provided</u>, <u>however</u>, if an appeal, or writ of certiorari, reargument or rehearing thereof has been filed or sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; <u>provided</u>, <u>further</u>, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be but has not then been filed with respect to such order, shall not cause such order not to be a Final Order.

**1.42** "<u>General Unsecured Claim</u>" means any Unsecured Claim against the Debtor that is not an Administrative Expense Claim, Priority Tax Claim or Priority Non-Tax Claim.

**1.43** "<u>GFNP</u>" shall mean GFNP LLC, the entity currently holding all of Sands Capital LLC's former rights, titles and interests in connection with the Debtor's Estate, including the GFNP Leasehold Mortgage (defined below). Some of Debtor's principals are shareholders in GFNP.

**1.44** "<u>GFNP Leasehold Mortgage</u>" means that certain Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated January 27, 2021, made by BHG in favor of Sands Capital, recorded on February 23, 2021 as CRFN 2021000064745 in the Office of the City Register of the City of New York, and subsequently sold and assigned to GFNP.

**1.45** "<u>Holder</u>" means any Person that holds a Claim against the Debtor.

**1.46** "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**1.47** "Insurance Policies" means any policy of insurance and any agreements relating thereto that may be available to provide coverage for Claims against the Debtor, its officers, directors, trustees, or any other Person.

**1.48** "Lease" means that certain Agreement of Lease, dated as of August 4, 2017 and amended as of April 1, 2019, by and between BHG, as tenant, and Debtor, as landlord.

**1.49** "Leasehold Interest" means all of BHG's right, title and interest in and to the Lease and the Property pursuant to the Lease.

**1.50** "Lien" means a "lien" as defined by section 101(37) of the Bankruptcy Code.

**1.51** "Mechanic's Lien Claims" means any Claim alleged to have arisen against the Debtor or the Property by reason of the performance of work or services, or provision of labor, materials or supplies, to or for the benefit of the Property.

**1.52** "Person" means any individual, corporation, partnership, association, joint venture, limited liability company, limited liability partnership, estate, trust, receiver, trustee, unincorporated organization or governmental unit or subdivision thereof or other entity.

**1.53** "Petition Date" means February 16, 2022, the date upon which the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and the instant Case was commenced.

**1.54** "Plan" means this Plan and any exhibits or schedules annexed hereto or otherwise filed in connection with the Plan, and any documents delivered in connection herewith, as the same may be amended or modified from time to time by any duly authorized and permitted amendment or modification.

**1.55** "Post-Confirmation Expenses" means the administrative expenses accrued following the Effective Date, including without limitation, all fees and expenses of any expenses incurred by the Debtor after confirmation of this Plan.

**1.56** "Priority Non-Tax Claim" means an Unsecured Claim, other than an Administrative Expense Claim, a Priority Tax Claim, or a General Unsecured Claim, which is entitled to priority in payment under sections 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.57** "Priority Tax Claim" means an Unsecured Claim or a portion of an Unsecured Claim of a governmental unit against the Debtor which is entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code and the Property Tax Claims, as defined below.

**1.58** "<u>Professional Fee Claim</u>" means any Claim of a professional retained in the Case pursuant to sections 327 or 1103 of the Bankruptcy Code, for compensation or reimbursement of costs and expenses relating to services incurred prior to and including the Effective Date, when and to the extent any such Claim is Allowed by the Bankruptcy Court pursuant to sections 330, 331, 503(b), or 1103 of the Bankruptcy Code.

**1.59** "<u>Professionals</u>" means those professional persons, including lawyers, financial advisors, and accountants and other professionals retained by the Debtor.

**1.60** "<u>Property</u>" means the real property located at 1325-1339 Atlantic Ave., Brooklyn, New York (Block 1868, Lot(s) 77, 80), which shall be sold as soon as practicable after the Effective Date.

**1.61** "<u>Property Sale</u>" means the Debtor's sale of the Fee Interest in the Property, subject to the Leasehold Interest, pursuant to the Sale and Purchase Agreement approved by the Bankruptcy Court pursuant to the Confirmation Order.  Such sale shall be structured so that it qualifies under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986, as amended (a "<u>Like-Kind Exchange</u>"). The Buyer agrees to cooperate with the Debtor by taking such actions as are reasonably required to effectuate such a Like-Kind Exchange, including, but not limited to (i) the execution of any and all documents, either in customary form used by a qualified intermediary, or subject to the reasonable approval of Buyer's counsel, as are requested in connection therewith; and (ii) the use of a qualified intermediary.

**1.62** "<u>Property Tax Claims</u>" means, collectively, the Claims of NYCTL 1998-2/MTAG (Proof of Claim No. 18), NY Department of Finance (Proof of Claim No. 4) and NYC Water Board (Proof of Claim No. 2).

**1.63** "<u>Purchase Price</u>" means the purchase amount to be paid in exchange for the Debtor's Fee Interest in the Property pursuant to the Sale and Purchase Agreement totaling THIRTEEN MILLION TWO HUNDRED THOUSAND ($13,200,000.00) DOLLARS.

**1.64** "<u>Sale and Purchase Agreement</u>" means the agreement by and between the Debtor and Lazar Waldman for the Property Sale and establishing the terms of the same, including the sale of the Debtor's Fee Interest in the Property, subject to the Leasehold Interest, to Waldman.  A copy of the same is attached hereto as <u>Exhibit B</u>.

**1.65** "<u>Sands Capital</u>" shall mean Sands Capital LLC, the former holder of the GFNP Leasehold Mortgage.

**1.66** "<u>Scheduled Claim</u>" means a Claim that is listed in the Debtor's Schedules.

**1.67** "<u>Schedules</u>" means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, statement of financial affairs, and other schedules and statements filed by the Debtor pursuant to Federal Rule of Bankruptcy Procedure 1007, and any amendments thereto.

**1.68**    "Tax Information" shall have the meaning set forth in Section 9.12(a) of this Plan.

**1.69**    "Tax Information Request" shall have the meaning set forth in Section 9.12(b) of this Plan.

**1.70**    "Transfer Taxes" shall mean any and all real estate transfer, stamp, sales, use, mortgage recording, or similar taxes, if and as applicable, that, absent the operation of Section 1146 of the Code, may be incurred or arise in connection with the transactions contemplated by the Plan.

**1.71**    "Unclaimed Distribution" means any Distribution that is unclaimed after ninety (90) days following any Distribution Date. Unclaimed Distributions shall include, without limitation: (i) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address; (ii) funds representing checks which have not been paid; and (iii) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a valid address.

**1.72**    "Unsecured Claim" means any Claim which is not secured by an offset or "lien," as that term is defined in section 101(37) of the Bankruptcy Code, including, but not limited to, a "judicial lien" as that term is defined at section 101(36) of the Bankruptcy Code, against any property of the Estate, but only to the extent of the "value," as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012, or as otherwise agreed to, of such Creditor's interest in the Debtor's interest in such property.

**1.73**    "U.S. Trustee" means any and all representatives and employees of the Office of the United States Trustee for the Southern District of New York.

**1.74**    "Waldman" means Lazar Waldman.

## B.    Rules of Interpretation.

For purposes of this Plan: (a) where appropriate in the relevant context, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any references in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in the Plan, any reference in the Plan to an existing document or appendix filed or to be filed means such document or appendix, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) unless otherwise specified herein, any reference to a Person as a Holder of a Claim includes that Person's successors and assigns; (e) unless otherwise specified, all references in the Plan to Sections and Articles are references to Sections and Articles of or to the Plan; (f) the words "herein", "hereto" and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the Plan. To the extent that the Plan is inconsistent with the Disclosure Statement or provisions of

the documents comprising the Plan Supplement, unless such document specifically states otherwise, the provisions of the Plan shall be controlling.

## C. **BHG Settlement Agreement**.

The terms of the BHG Settlement Agreement, annexed hereto as <u>Exhibit A</u> and incorporated herein as if set forth in full, shall govern to the extent of any inconsistency between it and any term of this Plan.

## D. **Representative of Debtor Post-Confirmation**

Esther Green-Blumenfeld shall remain the managing member of the Debtor post-confirmation of this Plan and will oversee the distribution of the proceeds from the Property Sale to Claimants as described in more detail below. She will not receive any compensation in connection with her post-confirmation work.

## ARTICLE 2 - PAYMENT OF CLAIMS NOT REQUIRED TO BE CLASSIFIED

### 2.1 **Claims Not Classified**.

No class is designated for Administrative Expense Claims, Professional Fee Claims, Property Tax Claims and Priority Tax Claims.

(a)     Administrative Expense Claims.

All Allowed Administrative Expense Claims, other than Professional Fee Claims, shall be paid by the Debtor, in full, in Cash, in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's liquidation or (c) as may be agreed upon between the Holder of any such Administrative Expense Claim and the Debtor.  In the event there exists any Disputed Administrative Expense Claims on the Effective Date, the Debtor shall at all times hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Administrative Expense Claims. Administrative Expense Claims are not Impaired by the Plan.

(b)     Priority Tax Claims.

Allowed Priority Tax Claims are the responsibility of the BHG Claimants under the terms of the Lease and shall be satisfied in full by the BHG Claimants under the terms of the BHG Settlement Agreement on or before the Effective Date. Priority Tax Claims are not Impaired by the Plan.

(c)     Property Tax Claims.

The Property Tax Claims are the responsibility of the BHG Claimants under the terms of the Lease and shall be satisfied in full by the BHG Claimants under the terms of the BHG Settlement Agreement on or before the Effective Date. Property Tax Claims are not Impaired by the Plan.

(d)      Professional Fee Claims.

The Debtor shall pay all Professional Fee Claims as soon as practicable after a Final Order has awarded such compensation and reimbursement of expenses pursuant to proper application in accordance with Section 5.9 hereof.   In the event any Disputed Professional Fee Claims exist on the Effective Date, the Debtor shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Professional Fee Claims are not Impaired by the Plan.

## ARTICLE 3 - CLASSIFICATION OF CLAIMS

### 3.1      Criterion of Class.

A Claim is in a particular Class only to the extent that the Claim qualifies within the description of that Class, and is in a different Class or Classes to the extent that the remainder of the Claim qualifies within the description of the different Class or Classes.

### 3.2      Class Categories.

The following classes of Claims are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

| Class | Claim | Total Amount | Treatment | Status | Voting Rights |
|-------|-------|--------------|-----------|--------|---------------|
| Class 1 | Mechanic's Lien Claims | $ 4,059,071.50[1] | Plan § 4a | Unimpaired | Deemed to Accept |
| Class 2 | General Unsecured Claims | $    612,160.00 | Plan § 4b | Unimpaired | Deemed to Accept |
| Class 3 | Equity Interests | $ 13,200,000.00[2] | Plan § 4d | Unimpaired | Deemed to Accept |

## ARTICLE 4 - TREATMENT OF CLASSES OF CLAIMS

The following treatment of and consideration to be received by Holders of Allowed Claims pursuant to this Plan shall be in full and final satisfaction of such Allowed Claims.

---

[1] This amount is subject to reduction pursuant to the terms of the BHG Settlement Agreement.
[2] It is anticipated that at the time of Confirmation of the Plan and final approval of the Disclosure Statement, there will be no General Unsecured Claims and all proceeds of the Property Sale shall pass to the Equity Interests.

### a. **Class 1 (Mechanic's Lien Claims).**

On or after the Effective Date, pursuant to the terms of the BHG Settlement Agreement, each Holder of an Allowed Mechanic's Lien Claim shall be paid in full by the BHG Claimants, or as otherwise agreed upon in writing by the Holder of the Mechanic's Lien Claim and the BHG Claimants, in full and final satisfaction of such Allowed Mechanic's Lien Claim.

### b. **Class 2  (General Unsecured Claims)**

On or after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, one or more distributions on a *pro rata* basis, one hundred percent (100%) of such Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim from the proceeds of the Property Sale, or such lesser treatment as to which the Debtor and the Holder of any such Allowed General Unsecured Claim shall have agreed upon in writing.

### c. **Class 3 (Equity Interests)**.

The Holder of Interests shall receive one or more distributions up to one hundred percent (100%) of such Interests on or after the Effective Date in full and final satisfaction of such Interests from the proceeds of the Property Sale after satisfaction in full of all Allowed Claims, or such lesser treatment as to which the Debtor and the Holder of such Interests shall have agreed upon in writing.

## ARTICLE 5 - MEANS OF IMPLEMENTATION OF THE PLAN

### 5.1 **Plan Funding**.

(a)      As a condition to effectiveness of this Plan, the Debtor must close the Property Sale. The Property Sale is intended to be exempt from otherwise applicable Transfer Taxes in accordance with Section 1146(a) of the Bankruptcy Code.

(b)      The Debtor is authorized to structure the Property Sale pursuant to the terms of the Sale and Purchase Agreement so that it qualifies under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986, as amended (a "Like-Kind Exchange").  Waldman agrees to cooperate with Debtor by taking such actions as are reasonably required to effectuate such a Like-Kind Exchange, including but not limited to (i) the execution of any and all documents, either in customary form used by a qualified intermediary, or, subject to the reasonable approval of Waldman's counsel, as are requested in connection therewith; and (ii) the use of a qualified intermediary.

(c)      The Plan and the Distributions hereunder shall be funded by the net proceeds of the Property Sale, provided that the Property Tax Claims, Priority Tax Claims, Allowed Mechanic's Lien Claims, and a portion of outstanding U.S. Trustee fees shall be satisfied by the BHG Claimants pursuant to the terms of the BHG Settlement Agreement as provided herein.

**5.2    Approval of Sale and Purchase Agreement and BHG Settlement Agreement**

(d)    In accordance with Section 1123(b) of the Bankruptcy Code and Rule 9019, the filing of the Plan shall constitute a motion for an order of the Bankruptcy Court approving, and the Confirmation Order shall constitute the Bankruptcy Court's approval of, the Debtor's entry into and performance under the BHG Settlement Agreement, attached hereto as <u>Exhibit A</u> and incorporated herein by reference, and the Sale and Purchase Agreement, attached hereto as <u>Exhibit B</u> and incorporated herein by reference, and all documents ancillary to or executed in connection with the foregoing, and the Debtor's taking all actions necessary or appropriate to consummate the transactions contemplated thereby, as fair and equitable and in the best interests of the Debtor's Estate. Pending the Closing of the Property Sale, the Debtor shall be authorized to continue to operate, maintain and preserve the Property. On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate or further evidence the terms and provisions of the BHG Settlement Agreement and Sale and Purchase Agreement and related agreements.

(e)    The consummation of the closing of the Property Sale is a transfer under, pursuant to, in connection with and in furtherance of the Plan, and the Confirmation Order will provide that such sale, transfer and delivery of any and all instruments of transfer, including, without limitation, the applicable deed, in connection therewith shall not incur any Transfer Taxes as permitted by Section 1146(a) of the Code as interpreted by the Supreme Court in *Florida Department of Revenue v. Piccadilly Cafeterias, Inc*., 128 S.Ct. 2326 (2008).

(a)    The Debtor is authorized to structure the Property Sale pursuant to the terms of the Sale and Purchase Agreement so that it qualifies under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986, as amended (a "<u>Like-Kind Exchange</u>").  Waldman agrees to cooperate with Debtor by taking such actions as are reasonably required to effectuate such a Like-Kind Exchange, including but not limited to (i) the execution of any and all documents, either in customary form used by a qualified intermediary, or, subject to the reasonable approval of Waldman's counsel, as are requested in connection therewith; and (ii) the use of the qualified intermediary.

**5.3    Establishment of Reserves and Funds**.

(a) <u>Administrative Reserve</u>. On or prior to the Effective Date, the Administrative Reserve shall be established by the Debtor.  If the Debtor determines that additional funding of the Administrative Reserve is required, from time to time, following the Effective Date, such funding shall be made from available Cash, if any. The Administrative Reserve shall be used to pay the Post-Confirmation Expenses, if any.

(b) <u>Disputed Claim Reserves</u>. As soon as practicable following the Effective Date, Disputed Claim Reserves shall be established by the Debtor or the BHG Claimants[3], if and as required; provided, however, that the Debtor or BHG Claimants shall have no obligation to fund the Disputed Claim Reserves until, at the latest, immediately prior to the making of a Distribution to Holders of Allowed Claims. The Disputed Claim Reserves shall be funded from available Cash in the Debtor's Estate or, where applicable, by the BHG Claimants directly, in an amount equal to the amount Holders of Disputed Claims would have otherwise been entitled but for the dispute. The assets in the Disputed Claim Reserves shall be held separately from other assets held by the Debtor, as applicable, subject to an allocable share of all expenses and obligations, on account of Disputed Claims. Funds shall be removed from the Disputed Claims Reserves as the Disputed Claims are resolved, which funds shall be distributed as provided in section 9.19 of the Plan. Notwithstanding any other provision of the Plan to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Debtor may treat any assets allocable to, or retained on account of, the Disputed Claims Reserves as held by one or more discrete entities for federal, and applicable state, local or other, income tax purposes, and may determine that such entity or entities shall constitute "disputed ownership funds" under, and may make the election permitted by, Treasury Regulation 1.468B-9, or any successor provision thereto. All recipients of Distributions under the Plan shall be bound by, and shall report consistent with, such income tax treatment.

## 5.5  **Preservation of Causes of Action**.

Except as otherwise provided in this Plan or in any contract, instrument, release or agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtor or the Estate may have against any person or entity are preserved, including without limitation, any and all Causes of Action under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code.  The Debtor shall have standing to pursue any and all Causes of Action pursuant to this Plan.

## 5.6  **Disposition of Records**.

A representative of the Debtor shall dispose of the Debtor's books and records as determined in their reasonable discretion.

---

[3] As applicable to Disputed Mechanic's Lienholder Claims which are the sole responsibility of the BHG Claimants as per the terms of the BHG Settlement Agreement.

**5.7** **General Disposition of Assets**.

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of this Plan, as soon as is reasonably practicable following the Effective Date, the Debtor shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Debtor shall determine is in the best interests of the Estate.

**5.8** **Administrative Expense Claims Bar Date**.

With the exception of Professional Fee Claims, persons asserting and Administrative Expense Claim must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on the date that is 30 days after notice of the Effective Date has been mailed (the "Administrative Expense Claims Bar Date"). No payment or Distributions will be made on account of any Administrative Expense Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file and serve an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from asserting any such right to payment as against the Debtor and its Estate.

**5.9** **Deadline for Filing Applications For Payment of Professional Fee Claims**.

All parties seeking payment of Professional Fee Claims arising prior to the Effective Date must file with the Bankruptcy Court a final application and/or an application for payment of reasonable fees and expenses on the date that is 30 days after notice of the Effective Date has been mailed (the "Fee Application Deadline"). Any Professional failing to file and serve such application on or before the Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtor and its Estate.

**5.10** **Execution of Documents to Effectuate Plan**.

From and after the Effective Date, the Debtor shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan. Entry of the Confirmation Order shall authorize the Debtor to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action.

**5.11** **Dissolution Upon Closing of the Case**.

Following the Effective Date, the Debtor, shall continue in existence for the purposes of, among other things, completing the liquidation of its Assets, winding up its affairs and filing appropriate tax returns. Upon the entry of an order closing this Case, the Debtor shall be deemed dissolved for all purposes. No other actions or filings or payments shall be required in furtherance of such dissolution.

### 5.12    **Post-Confirmation Reports and Fees**.

Following the Effective Date and until the Case is closed, not less than once every ninety (90) days, the Debtor shall file all post-Effective Date reports required during such periods and shall pay from the Administrative Reserve all post-Effective Date fees charged or assessed against the Estate under 28 U.S.C. §1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717.

### 5.13    **Closing of Case**.

Notwithstanding anything to the contrary contained herein, after confirmation of the Plan, after the distribution of the proceeds of the Property Sale in accordance with the terms of the Plan, the Debtor may seek to close the Chapter 11 Case and render final report on notice to Holders of then Allowed Claims.

### 5.14    **Insurance Preservation**.

Nothing in this Plan shall diminish or impair the enforceability of any Insurance Policies that may cover Claims against the Debtor or any other Person.

## ARTICLE 6 - TREATMENT OF EXECUTORY CONTRACTS & UNEXPIRED LEASES

### 6.1    **General Provisions**.

Except the Lease, which shall be dealt with pursuant to the terms of the Sale and Purchase Agreement, all executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

### 6.2    **Notice of Deemed Rejection/Rejection Bar Date**.

Any party to an executory contract or unexpired lease that is rejected in accordance with Section 6.1 shall file a proof of Claim for damages from such rejection no later than thirty (30) days after the Effective Date.  The failure to timely file a proof of Claim shall be deemed a waiver of any Claim in connection with the rejection of such contract or lease.

## ARTICLE 7 - CONDITIONS PRECEDENT

### 7.1    Conditions Precedent to Confirmation of the Plan.

The following conditions must be satisfied, or otherwise waived in accordance with Section 7.3, on or before the Confirmation Date:

(a)    The Disclosure Statement Approval Order shall have been entered and shall have become a Final Order; and

(b)    the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtor and shall contain provisions that, among other things, (i) authorize the implementation of the Plan in accordance with its terms, (ii) approve in all respects the transactions and agreements effected pursuant to the Plan, including the Sale and Purchase Agreement and the transactions contemplated thereby; and (iii) find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud.

### 7.2    Conditions Precedent to the Effective Date.

The Effective Date shall not occur and no obligations under the Plan shall come into existence, unless each of the following conditions is met or, alternatively, is waived in accordance with Section 7.3 hereof, on or before the Effective Date:

(a)    The Confirmation Order shall have been entered and no stay of its effectiveness shall have been issued within fourteen (14) days following the entry of the Confirmation Order;

(b)    the Closing (as defined in the Sale and Purchase Agreement) of the Property Sale shall have occurred.

### 7.3    Waiver of Conditions Precedent.

Each of the conditions precedent in Sections 7.1 and 7.2 hereof may be waived or modified without further Court approval, in whole or in part, but only with the consent of the Debtor.

### ARTICLE 8 - INJUNCTION; RELEASES; EXCULPATION

### 8.1    General Injunctions.

**The following provisions shall apply and shall be fully set forth in the Confirmation Order.**

(a)    **Injunctions Against Interference with Consummation or Implementation of Plan.  All Holders of Claims shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor or the Estate with the intent or effect of interfering with the consummation and implementation of this Plan and the transfers, payments and Distributions to be made hereunder.**

(b)    **Plan Injunction.  Except as otherwise specifically provided for by this Plan, as of and from the Effective Date, all Persons shall be enjoined from (i) the**

enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any encumbrance of any kind; and/or (iii) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor or the Estate to the fullest extent authorized or provided by the Bankruptcy Code.

**8.2    Exculpation.**  As of the Confirmation Date, the Debtor and its professionals (including professional firms and individuals within such firms) shall be deemed to have solicited any required acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  To the fullest extent permitted by section 1125(e) of the Bankruptcy Code, the Debtor and its professionals (including professional firms and individuals within such firms) (acting in such capacity), shall not have or incur any liability to any Holder of any Claim or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Case, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Case, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Article 5 of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions constituting fraud, willful misconduct or gross negligence as determined by a Final Order; and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**8.3    No Bar to Claims Against Third Parties**.

Except as set forth herein, Holders of Claims against the Debtor are not barred or otherwise enjoined by the Plan from pursuing any recovery against Persons that are not the Debtor.

**8.4    All Distributions Received in Full and Final Satisfaction**.

Except as otherwise set forth herein, all payments, all Distributions to be made in accordance with the Plan on account of Claims, and all rights conferred under this Plan shall be received in full and final satisfaction of the Estate's obligations for such Claims as against the Debtor, its property and the Estate.

**8.5    No Modification of Res Judicata Effect**.

The provisions of this Article 8 are not intended, and shall not be construed, to modify the res judicata effect of any order entered in the Case, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

**8.6    No Discharge**.

Pursuant to Bankruptcy Code § 1141(d)(3), the Confirmation Order will not discharge the Debtor of any debts.

## ARTICLE 9 - PROVISIONS GOVERNING DISTRIBUTIONS

### 9.1    __Distributions__

(a)    <u>Generally</u>. The Debtor shall make Distributions in accordance with Article 4 of the Plan. The Debtor may use the services of a third party to aid in the Distributions required to be made under this Plan.

### 9.2    __Indefeasibility of Distributions__. All Distributions made under the Plan shall be indefeasible.

### 9.3    __Frequency of Distributions__.

The Debtor shall make distributions as soon as practicable after the Closing of the Property Sale, or such other times that it determines appropriate, in its discretion.

### 9.4    __Payment in U.S. Dollars__.

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on domestic bank(s) selected by the Debtor in accordance with the Plan or by wire transfer from a domestic bank.

### 9.5    __Claims In U.S. Dollars__.

Any Claims asserted in foreign currencies shall be converted to United States Dollars in accordance with the prevailing exchange rates published by the Wall Street Journal on the Confirmation Date.

### 9.6    __Distributions Only on Business Days__.

Notwithstanding the foregoing provisions, if any Distribution called for under this Plan is due on a day other than a Business Day, then such Distribution shall instead be due the next Business Day.

### 9.7    __Transmittal of Payments and Notices__.

Except as otherwise provided in the Plan, all Distributions shall be made to the Holder of an Allowed Claim by regular first-class mail, postage prepaid, in an envelope addressed to such Holder at the address listed on its proof of Claim filed with the Bankruptcy Court or, if no proof of Claim was filed, (i) at the address listed on the Debtor's Schedules, or (ii) at such address that a Holder of a Claim provides to the Debtor after the Effective Date in writing at least fifteen (15) business days prior to a Distribution Date. The Debtor shall have no duty or obligation to ascertain the mailing

address of any Holder of a Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing.  Payments made in accordance with the provisions of this Section shall be deemed made to the Holder regardless of whether such Holder actually receives the payment.

### 9.8    Record Date for Distributions.

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings ("Claim Transfer Document") made on or before the Effective Date (the "Distribution Record Date") shall be treated as the Holders of those Claims for all purposes of this Plan, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Record Date.  The Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making a Distribution with respect to any Allowed Claim, the Debtor shall be entitled to recognize and deal for all purposes hereunder only with the Person who is listed on the proof of Claim filed with respect to such Claim, on the Debtor's Schedules as the Holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Record Date.

### 9.9    Unclaimed Distributions.

Unclaimed Distributions (including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Debtor as undeliverable to the addresses of record as of the Record Date, shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court.  Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of the Plan.

### 9.10    No Payments of Fractional Cents or Distributions of Less Than One Hundred Dollars.

(a)    Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with a half-penny or less being rounded down and fractions in excess of half of a penny being rounded up.

(b)    Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no Distribution of less than Two Hundred Dollars ($200) shall be made pursuant to the Plan. Whenever any Distribution of less than Two Hundred Dollars ($200) under the Plan would otherwise be required, such funds will be retained by the Debtor, as applicable, for the account of the recipient until such time that successive Distributions aggregate to Two Hundred Dollars ($200), at which time such payment shall be made, and if successive Distributions do not ever reach Two Hundred

Dollars ($200) in the aggregate, then such Distributions shall revert to the Estate and redistributed in accordance with the Plan.

**9.11    Setoff and Recoupment**.  Except as otherwise provided in the Plan, the Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Debtor may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor of any right of setoff or recoupment against the Holder of any Claim.

**9.12    Payment of Taxes on Distributions Received Pursuant to the Plan**.

(a)    Notwithstanding any provision to the contrary herein, as a condition to payment of any Distribution to a Creditor under this Plan, each Creditor shall provide a valid tax identification or social security number (collectively the "Tax Information") for purposes of tax reporting by the Debtor.  All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

(b)    At such time as the Debtor believes that Distributions to a particular Class of Claims is likely, the Debtor shall request Tax Information in writing from Creditors (the "Tax Information Request").  Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request, shall forfeit all Distributions such Creditor may otherwise be entitled to under this Plan and such forfeited funds will revert to the Estate, as applicable, to be disbursed in accordance with the terms and priorities established in this Plan.

**9.13    Compliance With Tax Withholding and Reporting Requirements**.

With respect to all Distributions made under the Plan, the Debtor will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

**9.14    Disputed Distribution**.

If a dispute arises as to the identity of a Holder of an Allowed Claim who is to receive a Distribution, the Debtor may, in lieu of making such Distribution to such Holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

**9.15    Claims Administration Responsibility**.

(a)    Reservation of Rights.  Unless a Claim is specifically Allowed prior to or after the Effective Date, prior to the Effective Date, the Debtor, and after the Effective Date, the Debtor, reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including without limitation any and all objections to the validity or amount of

any and all alleged Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Debtor's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of the Claim.

(b)     Objections to Claims.  Prior to the Effective Date, the Debtor shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Debtor may dispute, object to, compromise or otherwise resolve all Claims.  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than one hundred eighty (180) days after the Effective Date, provided that the Debtor may request (and the Bankruptcy Court may grant) an extension of time by filing a motion with the Bankruptcy Court.

(c)     Filing Objections.  An objection to a Claim shall be deemed properly served on the claimant if the Debtor effects service of any such objection in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's proof of claim at least thirty (30) days prior to the hearing thereon. The Debtor may also effectuate service of an objection to a claim: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, to the signatory on the proof of claim or interest or other representative identified on the proof of claim or interest or any attachment thereto or; (iii) by first class mail, postage prepaid, on counsel that has appeared on the behalf of the claimant in the Case.

(d)     Determination of Claims.  Except as otherwise agreed by the Debtor, any Claim as to which a proof of claim or motion or request for payment was timely filed in the Case may be determined and liquidated after the Effective Date pursuant to (i) an order of the Bankruptcy Court (which order has not been stayed, reversed or amended and as to which determination or any revision, modification or amendment thereof, and the time to appeal or seek review or rehearing thereof, has expired, and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending), or (ii) applicable non-bankruptcy law.  Any Claim determined to be an Allowed Claim after the Effective Date pursuant to this section shall be treated as an Allowed Claim in accordance with the Plan.

### 9.16    **Disallowance of Claims without Further Order of the Court**.

As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a proof of Claim has not been filed by the Creditor, shall be deemed Disallowed and expunged without further Order of the Bankruptcy Court. All Scheduled Claims that correspond to a proof of Claim filed by a particular Creditor shall be deemed to have been superseded by such later filed proof of Claim and the Scheduled Claims, regardless of priority, and shall be expunged from the

claims register; provided however, that such proofs of Claim shall be subject to objection in accordance with Section 9.15 hereof.

**9.17    Disputed Claims**.

(a) Except to the extent the Court determines that a lesser amount is adequate, the Debtor or the BHG Claimants[4] shall, on each Distribution Date, deposit in a Disputed Claims Reserve, Cash equal to the Distributions that would have been made to Holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the Holder of such Claim has agreed in writing or, in the case where any such Claim is unliquidated and/or contingent, the greater of (i) $1, and (ii) such other amount as is reserved by order of the Bankruptcy Court made upon motion of the Debtor or the Holder of such Claim.

(b) For purposes of effectuating the provisions of this Section 9.17 and the Distributions to Holders of Allowed Claims, the Court, upon the request of any Holder of a Claim, on the one hand, or the Debtor on the other hand, may liquidate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under this Plan and for purposes of the Disputed Claims Reserve.

(c) When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the provisions of this Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such Holder would have been entitled if such Holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

(d) In no event shall any Holder of any Disputed Claim be entitled to receive (under this Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for such Disputed Claim pursuant to this Section 9.17.  In no event shall the Debtor have any responsibility or liability for any loss to or of any amount reserved under this Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence.  In no event may any Creditor whose Disputed Claim is subsequently Allowed, pursue or recover or from any other Creditor in respect of any funds received as Distributions under the Plan.

(e) To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Debtor shall make, in accordance with the terms of this Plan, a Distribution of the excess amount reserved for such Disputed Claim.

(f) Any Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated

---

[4] As applicable to Disputed Mechanic's Lien Holder Claims.

with taxation.

**9.18** **Limitations on Funding of Disputed Claims Reserve**.    Except as expressly set forth in the Plan, or otherwise agreed to in writing or ordered by the Court, neither the Debtor shall have no duty or obligation to fund the Disputed Claims Reserve.

**9.19** **Timing of Distributions on Disputed Claims Subsequently Allowed**.

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date that is at least fifteen (15) business days after such Claim is Allowed.

**9.20** **No Payment or Distribution on Disputed Claims**.

Notwithstanding any provision to the contrary herein, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim or some portion thereof is Allowed by Final Order of the Bankruptcy Court.   For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution.   Holders of Disputed Claims shall be bound, obligated and governed in all respects by this Plan.

## ARTICLE 10 - PLAN INTERPRETATION, CONFIRMATION AND VOTING

**10.1** **Procedures Regarding Objections to Designation of Classes as Impaired or Unimpaired**.

In the event the designation of the treatment of a Class as impaired or unimpaired is objected to, the Bankruptcy Court shall determine the objection and voting shall be permitted or disregarded in accordance with the determination of the Bankruptcy Court.

**10.2** **Withdrawal and Modification of Plan**.

This Plan may be withdrawn or modified by the Debtor at any time prior to the Confirmation Date.   The Debtor may modify the Plan in any manner consistent with section 1127 of the Bankruptcy Code prior to substantial consummation thereof.   Upon request by the Debtor, the Plan may be modified after substantial consummation with the approval of the Bankruptcy Court, provided that such modification does not affect the essential economic treatment of any Person that objects in writing to such modification.

**10.3** **Governing Law**.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or the Plan, the laws of the State of New York applicable to contracts executed in such State by residents thereof and to be performed entirely within such State shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with this Plan.

**10.4** **Voting of Claims**.

As there are no Impaired Claims under the terms of the Plan, votes will not need to be solicited.

**10.5** **Acceptance by Impaired Class**.

Consistent with section 1126(c) of the Bankruptcy Code, and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors shall have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the Holders of Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan. As there are no Impaired Claims under the terms of the Plan, votes will not need to be solicited.

**10.6** **Cram Down**.

The Debtor will request, in the event that at least one (1) impaired Class entitled to vote on the Plan accepts the Plan, that the Bankruptcy Court confirm the Plan in accordance with the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan over the possible rejection of the Plan by any impaired Class entitled to vote on the Plan and the Plan shall constitute a motion for such relief.

## ARTICLE 11 - RETENTION OF JURISDICTION BY BANKRUPTCY COURT

**11.1** From the Confirmation Date until entry of a final decree closing the Case, the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Case for the following purposes:

(a) to hear and determine any and all objections to the allowance of any Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtor to any Creditors, Holders of Claims, or other parties in interest;

(b) to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

(c) to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d) to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court including, but not limited to, the Causes of Action. For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction to hear and determine compromises and settlements of any and all Causes of Action;

(e) to enforce and interpret the provisions of this Plan and the Confirmation Order;

(f) to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

(g) to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

(h) to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and the intent of this Plan;

(i) to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code; and

(j) to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated.

## ARTICLE 12 - MISCELLANEOUS PROVISIONS

**12.1** __Headings__.

Headings are utilized in this Plan for the convenience of reference only, and shall not constitute a part of this Plan for any other purpose.

**12.2** __No Attorneys' Fees__.

No attorneys' fees with respect to any Claim shall be payable under the Plan, except as expressly specified herein or Allowed by a Final Order of the Bankruptcy Court.

**12.3** __Notices__.

All notices, requests and demands by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, (iii) reputable overnight delivery service, all charges prepaid, or (iv) electronic mail, and shall be deemed to have been given when received and confirmed by telephone or reply email by the following parties:

If to the Debtor:

1325 Atlantic Realty, LLC
c/o Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor

New York, New York 10036
Email: tklestadt@klestadt.com

With copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Attn:  Christopher J. Reilly
Email: creilly@klestadt.com

**12.4** **Binding Effect**.

The rights, benefits, and obligations of any Person named or referred to in the Plan, or whose actions may be required to effectuate the terms of the Plan, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person (including, but not limited to, any trustee appointed for the Debtor under chapter 7 or 11 of the Bankruptcy Code).   The Confirmation Order shall provide that the terms and provisions of the Plan and the Confirmation Order shall survive and remain effective after entry of any order which may be entered converting the Debtor's Case to a case under chapter 7 of the Bankruptcy Code, and the terms and provisions of the Plan shall continue to be effective in this or any superseding case under the Bankruptcy Code.

Dated: New York, New York
          May 17, 2023

                              1325 ATLANTIC REALTY, LLC


                              By: */s/ Esther Green-Blumenfeld*
                                      Esther Green-Blumenfeld, Managing
                                      Member

Approved as to form:

By: */s/ Tracy L. Klestadt*
      Tracy L. Klestadt


Klestadt Winters Jureller Southard &
Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245

*Counsel to the Debtor and Debtor in Possession*

# <u>Exhibit A</u>

[*to be supplemented with executed version substantially in the form attached when received*]

# SETTLEMENT AGREEMENT

**SETTLEMENT AGREEMENT** entered into this ___ day of May, 2023, by and among 1325 Atlantic Avenue Realty LLC ("Debtor"), Brooklyn Hospitality Group LLC ("BHG"), W. Development Corp. ("WDC"), Lazar Waldman ("Waldman") and GFNP LLC ("GFNP").

# W I T N E S S E T H :

**WHEREAS,** the Debtor owns certain real property located at 1325 Atlantic Avenue, Brooklyn, New York (the "Property"); and

**WHEREAS**, pursuant to an amended lease (the "Lease"), BHG is the sole tenant occupying the Property, and

**WHEREAS**, on or about January 27, 2021, Sands Capital LLC ("Sands Capital") loaned to BHG the principal sum of $6,400,000 (the "Sands Capital Loan") and received, *inter alia*, a promissory note from BHG (the "BHG Note"), a leasehold mortgage on the Lease and BHG's interest therein (the "Sands Capital Leasehold Mortgage"), and a guarantee of payment of the Sands Capital Loan by Waldman (the "Waldman Guarantee"); and

**WHEREAS**, on or around September 23, 2021, the Debtor, as plaintiff, commenced an action against BHG, Waldman and Sands Capital in New York Supreme Court for the County of Kings, Index No. 524178/2021 (the "State Court Action") by filing a complaint (the "Complaint"); and

**WHEREAS**, on November 8, 2021 BHG and Waldman filed an answer and counter claims in the State Court Action and a notice of pendency (the "Notice of Pendency") related to the Property; and

**WHEREAS**, on February 16, 2022, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Eastern District of New York under Docket number 22-40277 (the "Bankruptcy Case"); and

**WHEREAS**, on February 27, 2022, the Plaintiff filed a Notice of Removal of the State Court Action to the United States District Court for the Eastern District of New York (the "District Court"); and

**WHEREAS**, on March 22, 2023, the District Court issued a Memorandum and Order (the "Memorandum and Order") removing the State Court Action and referring the matter to the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") as being related to *In re 1325 Atlantic Realty, LLC*, Chapter 11 Case No. 22-40277; and

**WHEREAS** the State Court Action will be (but has not yet been) assigned an Adversary Proceeding number (the "Debtor's Adversary Proceeding"); and

**WHEREAS**, on November 28, 2022, BHG filed a complaint (the "BHG Complaint") against the Debtor in the Bankruptcy Court which was assigned Adversary Proceeding number 2201094 (the "BHG Adversary Proceeding"); and

**WHEREAS**, on January 19, 2023, the Debtor filed an answer to the BHG Complaint [Adv. Pro. Dkt. No. 3]; and

**WHEREAS**, BHG, WDC and Waldman separately filed claims numbered 12, 13 and 14 as against the Debtor in the Bankruptcy Case (collectively, the "BHG Claims"), which BHG Claims were contested by the Debtor' and

**WHEREAS**, GFNP heretofore purchased from Sands Capital all of Sands Capital's interest in the Sands Capital Loan, the BHG Note, the Sands Capital Leasehold Mortgage, the Waldman Guarantee, and all related loan and security documents, whereupon GFNP became the sole owner of the same and Sands Capital retained no further interest therein; and

**WHEREAS**, following mediation among the parties, the terms of a settlement among the Debtor, BHG, WDC and Waldman was placed on the record in the Bankruptcy Court on March 29, 2023 (the "Recorded Settlement Agreement"), and the parties now wish to further memorialize the terms of the Recorded Settlement Agreement in writing and confirm that all issues, actions, and proceedings among them are hereby settled and entirely resolved on the terms and conditions set forth in the Recorded Settlement Agreement and memorialized and/or further explained herein.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises hereafter contained herein, the parties agree as follows:

1. **Discontinuance of Adversary Proceedings and Withdrawal of BHG Claims**.

A. On or before May 4, 2023, and subject to receipt of the indemnity of Waldman by the principals of the Debtor (in the form annexed hereto as "Schedule 1") relating to the Waldman Guarantee, BHG shall:

    (i)    execute and deliver to the Debtor's counsel a Stipulation of Voluntary Dismissal of the BHG Adversary Proceeding, and all counterclaims asserted therein, with prejudice and without costs, whereupon the same shall be filed with the Bankruptcy Court; and

    (ii)    file with the Bankruptcy Court such documents as are necessary to withdraw with prejudice the BHG Claims (and any other claims by any Waldman-related party) in their entirety; and

    (iii)    execute and deliver to the Debtor's counsel a Stipulation of Voluntary Dismissal of the Debtor's Adversary Proceeding as to the Waldman Parties, with prejudice and without costs, whereupon the same shall be filed with the Bankruptcy Court.; and

(iv)    File in the State Court and serve on the Kings County Clerk, a withdrawal of the Notice of Pendency with prejudice, and submit proof of such filing to the Debtor's counsel.

B.    On or before May 4, 2023, and subject to receipt by the Debtor of the materials described in sub-section A of this Section 1, the Debtor shall execute and deliver to Waldman a conditional full release by GFNP (as assignee of Sands Capital) of all personal liability on the part of Waldman emanating out of the Waldman Guaranty, the BHG Promissory Note, the Sands Capital Leasehold Mortgage, and any other documents related to the Sands Capital Loan.

2.    **Purchase of the Property from the Debtor by Waldman**. Waldman or his designees and assigns (collectively, "Waldco")is hereby granted the option and right (the "Purchase Option") to purchase all right, title and interest of the Debtor in the Property pursuant to an Asset Purchase Agreement (in the form annexed hereto as Schedule 2") (the "APA"), naming Waldco as purchaser with a right to assign as applicable, for a total purchase price of Thirteen Million Two Hundred Thousand Dollars ($13,200,000.00 (the "Purchase Price").  Each of the following (the "BHG Obligations") shall remain the sole obligations of BHG and Waldco, and the Debtor shall have no obligations in regard to any of the following: (i) any and all existing property taxes (which must be paid by Waldman before or at the closing of Waldman's purchase of the Property) and (ii) the payoff of that portion of the GFNP Leasehold Mortgage equaling Three Million Dollars ($3,000,000) (which must be paid by Waldman before or at the closing of Waldman's purchase of the Property), and (iii) all mechanics liens allowed by the Bankruptcy Court after objection and reconciliation which Waldman may bring (which shall be paid by Waldman on or before the effective date of the Debtor's Plan of Liquidation, as hereinafter defined).  All of the BHG Obligations are debts due by BHG under the Lease, and all of the same shall be the exclusive obligation of BHG and Waldman.  As an inducement to GFNP to enter into this Agreement, Waldman may not close on the purchase of the Property while any of the BHG Obligations remain outstanding.  The APA and Waldman's purchase of the Property shall be on the following terms and conditions:

(i)    On or before June 5, 2023, Waldman shall provide to the Debtor's counsel a commitment letter (the "Purchase Commitment Letter") from a bank, lender, partner or investor with commercially acceptable proof of the financial wherewithal to finance Waldman's completion of his purchase the Property.  In the event that Waldman defaults in timely providing the Commitment Letter, **TIME BEING OF THE ESSENCE**, which default remains uncured for a period of five (5) days after written notice of the same is emailed to his counsel and Waldman with an opportunity to cure, (i) the Purchase Option and the APA shall be deemed extinguished and of no further legal force or effect, (ii) the Lease is deemed immediately terminated, and (iii) GFNP will be deemed to release its lien on the Leasehold and will have no claims of any kind, in law or in equity, against the Debtor or the Property.  Notwithstanding the termination of the Purchase Option and the APA, the discontinuances and withdrawals with prejudice referred to in **§** 1A of this Agreement shall remain in full force and effect and neither Waldman, BHG nor WDC shall have any other or further claims of any kind, in law or equity, against the Debtor or its principals.

Likewise, the conditional release given to Waldman pursuant to **§** 1B of this Agreement shall also remain in full force and effect.

(ii)     The closing of Waldman's purchase of the Property shall take place no later than sixty (60) days after the date of entry of an order by the Bankruptcy Court confirming the Plan of Liquidation.  In the event that Waldman fails to close by that date, a notice of default shall be sent by email to his counsel, whereupon the closing date shall be extended for a period of ten (10) days after such default notice is sent to Waldman's counsel (the "Final Closing Date"). In the event that Waldman fails to close by the Final Closing Date, **TIME BEING OF THE ESSENCE** , (i) the Purchase Option and the APA shall be deemed extinguished and of no further legal force or effect, (ii) the Lease is deemed immediately terminated, and (iii) GFNP will be deemed to release its lien on the Leasehold and will have no claims of any kind, in law or in equity, against the Debtor or the Property.  Notwithstanding the termination of the Purchase Option and the APA, the discontinuances and withdrawals with prejudice referred to in **§** 1A of this Agreement shall remain in full force and effect and neither Waldman, BHG nor WDC shall have any other or further claims of any kind, in law or equity, against the Debtor or its respective principals. Likewise, the conditional release given to Waldman pursuant to **§** 1B of this Agreement shall also remain in full force and effect.

(iii)     The Debtor may structure the sale of the Property pursuant to the terms of the Purchase Option and APA so that it qualifies under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986, as amended (a "Like-Kind Exchange"). Waldman agrees to cooperate with Debtor by taking such actions as are reasonably required to effectuate such a Like-Kind Exchange, including but not limited to (i) the execution of any and all documents, either in customary form used by a qualified intermediary (a "QI"), or, subject to the reasonable approval of Waldman's counsel, as are requested in connection therewith; and (ii) the use of a QI. The APA and the releases, however, are not conditioned upon any 1031 tax exchange.

**3.**     **BHG and Waldman Settlement with GFNP**.  Waldman and BHG, on the one hand, and GFNP, on the other hand, hereby settle and resolve all matters between them for a payment by Waldman for that portion of the GFNP Leasehold Mortgage equaling Three Million Dollars ($3,000,000) (which must be paid by Waldman before or at the closing of Waldman's purchase of the Property from BHG) on the following terms and conditions:

(i)     On or before April 24, 2023, Waldman shall deliver a non-refundable payment of One Million Dollars ($1,000,000.00) (the "Initial Non-refundable Payment") to Klestadt Winters Jureller Southard & Stevens, LLP, as escrow agent (the "Escrow Agent"), receipt of which is acknowledged.  Upon receipt of the Initial Non-refundable Payment by the Escrow Agent, the Escrow Agent shall pay the same to GFNP as a credit toward Waldman's $3,000,000 obligation to GFNP in connection with the payment of the GFNP Leasehold Mortgage, upon approval of this Agreement.  In the event that Waldco defaults in timely making the Initial Non-refundable Payment, **TIME BEING OF THE ESSENCE**, the Initial Non-refundable Payment shall remain the exclusive property of GFNP, free and clear of any claims thereto by Waldman, and GFNP shall have no further claims of any kind, in law or equity, against Waldman, BHG, the Debtor, their respective principals,

or the Property.  In such event, any other benefits to Waldman under this Agreement (including without limitation, his ability to exercise the Purchase Option and enter into the APA) shall be deemed extinguished and of no further legal force or effect.  Notwithstanding the loss of the Initial Non-refundable Payment and Waldman's loss of any additional benefits under this Agreement, the discontinuances and withdrawals with prejudice referred to in § 1A of this Agreement shall remain in full force and effect and neither Waldman, BHG nor WDC shall have any other or further claims of any kind, in law or equity, against GFNP or its principals. Likewise, the conditional release given to Waldman pursuant to § 1B of this Agreement shall also remain in full force and effect.

(ii)    On or before or at the closing of Waldman's purchase of the Property from BHG, Waldco shall pay the $2,000,000 balance owed on the BHG obligation to GFNP in connection with the payment of the GFNP Leasehold Mortgage (the "<u>Leasehold Purchase Balance</u>").  In the event that Waldco fails to timely close on the purchase of the Property or defaults in timely paying the Leasehold Purchase Balance to GFNP, **TIME BEING OF THE ESSENCE**, the Initial Non-refundable Payment shall remain the exclusive property of GFNP, free and clear of any claims thereto by Waldco, and GFNP shall have no further claims of any kind, in law or equity, against Waldman, Waldco, BHG, the Debtor, their respective principals, or the Property.  In such event, any other benefits to Waldco under this Agreement (including without limitation, the ability to exercise the Purchase Option and enter into the APA) shall be deemed extinguished and of no further legal force or effect.  Notwithstanding the loss of the Initial Non-refundable Payment and Waldco's loss of any additional benefits under this Agreement, the discontinuances and withdrawals with prejudice referred to in § 1A of this Agreement shall remain in full force and effect and neither Waldman, Waldco, BHG nor WDC shall have any other or further claims of any kind, in law or equity, against GFNP or its principals. Likewise, the conditional release given to Waldman pursuant to § 1B of this Agreement shall also remain in full force and effect.

(iii) On or before the effective date of the Debtor's Plan of Liquidation (as hereinafter defined), Waldco shall pay or resolve all mechanics liens allowed by the Bankruptcy Court after objection and reconciliation which Waldman may bring (the "<u>Allowed Mechanics Liens</u>").  In the event that Waldmco fails to timely p[ay or resolve all of the Allowed Mechanics Liens, **TIME BEING OF THE ESSENCE,** the Initial Non-refundable Payment shall remain the exclusive property of GFNP, free and clear of any claims thereto by Waldco, and GFNP shall have no further claims of any kind, in law or equity, against Waldman, Waldco, BHG, the Debtor, their respective principals, or the Property.  In such event, any other benefits to Waldco under this Agreement (including without limitation, the ability to exercise the Purchase Option and enter into the APA) shall be deemed extinguished and of no further legal force or effect.  Notwithstanding the loss of the Initial Non-refundable Payment and Waldco's loss of any additional benefits under this Agreement, the discontinuances and withdrawals with prejudice referred to in § 1A of this Agreement shall remain in full force and effect and neither Waldman, Waldco, BHG nor WDC shall have any other or further claims of any kind, in law or equity, against GFNP or its principals. Likewise, the conditional release given to Waldman pursuant to § 1B of this Agreement shall also remain in full force and effect.

4. **Appointment of Henoch Zaks as Manager**. Upon the execution of this Agreement, BHG and/or its assigns shall execute and deliver a document irrevocably appointing Henoch Zaks as the sole Special Manager of BHG and its assigns for the period of time between the date of approval of this Agreement and the closing of the purchase of the Property by Waldco (as described in **§** 2(iii) of this Agreement).  In the event that Waldco closes on the purchase of the Property, the appointment of Henoch Zaks as Special Manager of BHG and its assigns shall automatically terminate immediately after the said closing, and Henoch Zaks shall have no further authority with respect to BHG or its assigns in any capacity. In the event that Waldco fails to comply with any of the provisions described in **§** 3(i), (ii) or (iii) of this Agreement, such that the Purchase Option is terminated, Henoch Zaks, as Special Manager of BHG, shall surrender the Property to the Debtor, the Lease (in its original form and/or as assigned) shall be deemed null and void and of no further force or effect, and BHG and its assigns shall have no further claims of any kind, in law or in equity, with respect to the Property.  Upon such surrender, the appointment of Henoch Zaks as Special Manager  shall automatically terminate immediately. In the interim, BHG may assign the Lease to an affiliate of Waldco so that construction at the Property can resume before closing, with Waldco to be solely responsible for all construction expenses and to defend and indemnify the Debtor with respect thereto.  Waldco shall be given full access to the Property in order to resume construction.

5. **Withdrawal of Bid Procedures by Debtor**.  On or before the execution of this Agreement, the Debtor shall withdraw the motion to approve bidding procedures that it previously filed in the Bankruptcy Court.

6. **Plan of Liquidation and Disclosure Statement**. The Debtor shall file a plan of liquidation (the "Plan of Liquidation") and disclosure statement on or before May 10, 2023 and will request a combined approval hearing from the Court. In the event that the Commitment Letter is timely provided by Waldman pursuant to ¶3(ii) of this Agreement, Confirmation shall take place by June 30, 2023.  The Plan of Liquidation shall include provisions for transfer and mortgage tax exemptions as well as full releases previously given pursuant to this Agreement.

7. **Splitting of UST Fees**. The Debtor and BHG shall each pay one half (1/2) of the fees of the United States Trustee as due and payable in the Bankruptcy Case relating only to the direct distribution paid by the Debtor under the Plan of Liquidation to the Debtor's direct creditors. United States Trustee fees shall not include any funds paid by Waldman separately based upon assumptions to holders of mechanic's liens or real estate taxes.

8. **Miscellaneous Provisions**.

(a) This Agreement shall be governed by the law of the State of New York. Any controversy arising from, or related to, this Agreement shall be determined exclusively by the United States Bankruptcy Court for the Eastern District of New York.

(b)   All notices and instructions required or permitted by the terms of this Agreement shall be in writing and shall be sent email transmission to counsel for the party to receive such notice.

(c)   This agreement constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all prior and contemporaneous agreements, discussions, or understandings among the parties. This Agreement cannot be modified, changed, discharged, or terminated, except by an instrument in writing signed by all of the parties hereto. This Agreement is binding on and shall inure to the benefit of the parties hereto and their heirs, successors, estates, personal representative, affiliates, and subsidiaries.

(d)   Neither party has relied on any representation or warranty made by any other party as an inducement to enter into this Agreement except for those warranties and representations expressly set forth in this Agreement.

(e)   No waiver of a breach or default under any provision hereof shall be deemed a waiver of such provisions or of any subsequent breach or default of the same or any other term or condition of this Agreement.

(f)   No party to this Agreement shall be construed the drafter of the same for any purpose.

(g)   The parties hereto shall execute and deliver such other instruments and do such other acts as may be necessary to carry out the intent and purpose of this Agreement.

**IN WITNESS WHEREOF**, the parties have set their hand on the date and year first above-written.

1325 Atlantic Avenue Realty LLC

By: _____

Brooklyn Hospitality Group LLC

By: _____

W. Development Corp.

By: _____


_____
Lazar Waldman

GFNP LLC

By: _____

WALDCO

By: _____

**SCHEDULE 1**

**WALDMAN INDEMNITY**

**<u>SCHEDULE 1</u>**

**<u>APA</u>**

# **<u>Exhibit B</u>**

[*to be supplemented with executed version substantially in the form attached when received*]

## AGREEMENT OF SALE

**THIS AGREEMENT OF SALE** is made as of the date below by and between 1325 Atlantic Realty LLC ("*Seller*"), as debtor and debtor-in-possession in a case under chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*"), and LAZAR WALDMAN, an individual having an address at 311 Roebling Street, Brooklyn, New York 11211 ("*Purchaser*"); Seller and Purchaser sometimes together referred to as the "*Parties*".

## WITNESSETH:

**WHEREAS**, Seller is a debtor and debtor-in-possession in a chapter 11 bankruptcy case entitled *In re 1325 Atlantic Realty LLC,* Case No. 22-40277 (NHL) (the "*Bankruptcy Case*") pending before the United States Bankruptcy Court for the Eastern District of New York (the "*Bankruptcy Court*");

**WHEREAS**, the bankruptcy estate of Seller is the fee title owner of those industrial warehouse buildings bearing street addresses of **1325-1339 Atlantic Ave., Brooklyn, New York** as more particularly described in Exhibit "A" attached to this Agreement (collectively, the "*Premises*");

**WHEREAS**, the Premises is subject to that certain Agreement of Lease, dated as of August 4, 2017 and amended as of April 1, 2019 (the "*Lease*"), by and between Brooklyn Hospitality Group LLC ("*BHG*"), as tenant, and Seller, as landlord (all of BHG's right, title and interest in and to the Lease, the "*Leasehold Interest*");

**WHREAS**, Seller desires to sell to Purchaser and Purchaser agrees to purchase from Seller all of Seller's right, title and interest in and to the Premises subject to BHG.s rights in the Leasehold Interest and subject to the conditions of this Agreement;

**WHEREAS,** this Agreement is subject in all respects to the review and approval of the Bankruptcy Court; and

**WHEREAS, the Parties agree that the recitals set forth above and below are integral and material portions of this Agreement;**

**NOW, THEREFORE**, Seller and Purchaser, being legally bound and authorized, **DO HEREBY AGREE AS FOLLOWS**:

1.      **DEFINITIONS.**  For purposes of this Agreement, the following words and terms shall have the meanings specified in this Section 1:

(a) "*Agreement*" means when fully executed by Seller and Purchaser, this Agreement of Sale, together with all Exhibits annexed hereto.

(b) "*Bankruptcy Case*" has the meaning assigned to it in the recitals hereto.

(c) "*Bankruptcy Code*" has the meaning assigned to it in the Preamble.

(d)  "*Bankruptcy Court*" has the meaning assigned to it in the recitals hereto.

(e)  "*Bankruptcy Rules*" has the meaning assigned to it in <u>Section 3.1</u>.

(f)  "*BHG*" has the meaning assigned to it in the recitals hereto.

(g)  "*BHG Obligations*" has the meaning assigned to it in <u>Section 2.1</u>.

(h)  "*BHG Settlement Agreement*" means that certain Settlement Agreement dated as of [_____], 2023 by and among Seller, Purchaser, BHG, and W Development Corp., whereby, inter alia, Purchaser was granted the option to purchase the Premises subject to BHG's interests in the  Leasehold Interest.

(i)  "*Business Day*" means any day that is not a Saturday, Sunday or federal or state holiday in the state of New York, United States. Should any deadline set forth herein for any action fall on a day that is not a Business Day, such deadline shall be automatically extended to the next day that is a Business Day.

(j)  "*Clean Water Act*" has the meaning assigned to it in <u>Section 6</u>.

(k)  "*Closing*" has the meaning assigned to it in <u>Section 4.1</u>.

(l)  "*Closing Date*" means the date and time specified in <u>Section 4.1</u> of this Agreement on which title to the Premises are conveyed to Purchaser pursuant to this Agreement.

(m)  "*Confirmation Order*" means an Order of the Bankruptcy Court approving the Plan.

(n)  "*Date of this Agreement*" shall mean the date when an original Agreement, fully executed by Seller and Purchaser, together with all Exhibits annexed hereto is received by Purchaser.

(o)  "*Deed*" has the meaning assigned to in in <u>Section 10.1(a)</u>.

(p)  "*Default Notice*" has the meaning assigned to it in <u>Section 4.1</u>.

(q)  "*Execution Date*" means the date upon which a fully executed copy of this Agreement has been delivered to Seller and Purchaser.

(r)  "*Final Closing Date*" has the meaning assigned to it in <u>Section 4.1</u>.

(s)  "*Lease*" has the meaning assigned to it in the recitals hereto.

(t)  "*Lease Assignment*" has the meaning assigned to it in the recitals hereto.

(u)  "*Leasehold Interest*" has the meaning assigned to it in the recitals hereto.

(v)  "*Leasehold Mortgage*" shall mean that certain Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated January 27, 2021, originally made by BHG in favor of Sands Capital LLC in relation to a loan made by Sands Capital LLC to BHG and secured by the Leasehold Interest, and assigned to GFNP pursuant to the Leasehold Mortgage Assignment.

(w) "*Leasehold Mortgage Assignment*" shall mean that certain Assignment of Mortgage, dated as of ____, by and between Sands Capital LLC, as assignor, and GFNP LLC, as assignee, assigning the Leasehold Mortgage.

(x) "*Liens*" means, without limitation, all known and unknown liens, claims, liabilities, encumbrances, agreements and interests, whether of record or not of record, of every nature, kind and description, including, but not limited to, loans, union claims, pension claims, judgments, trade accounts payable balances, overages, factoring, intercompany financial liabilities, guarantees, leases, contingencies, personal liability, products liability, litigation claims and successor liability.

(y) "*Like-Kind Exchange*" has the meaning assigned to it in <u>Section 25</u>.

(z) "*Mechanic's Liens*" shall mean all mechanics' liens on the Premises allowed by the Bankruptcy Court after any potential objection and reconciliation.

(aa) "*Parties*" has the meaning assigned to it in the recitals hereto.

(bb) "*Permitted Exceptions*" has the meaning assigned to it in <u>Section 5.1</u>.

(cc) "*Plan*" means the chapter 11 plan of liquidation filed by Seller in the Bankruptcy Case.

(dd) "*Premises*" has the meaning assigned to it in the recitals hereto.

(ee) "*Purchase Price*" has the meaning assigned to it in <u>Section 2.1</u>.

(ff) "*Purchaser*" has the meaning assigned to it in the Preamble.

(gg) "*Real Estate Taxes*" shall mean all real estate taxes owed on the Premises.

(hh) "*Seller*" has the meaning assigned to it in the Preamble.

(ii) "*Title Company*" means Madison Title Agency, LLC or such company licensed in the State of New York chosen by Purchaser.

(jj) "*1031 Intermediary*" shall mean Madison Title Agency, LLC or such other qualified intermediary designated by Seller.

## 2. <u>PURCHASE PRICE</u>.

**2.1** <u>**Payment of Purchase Price.**</u>   The Purchase Price for the Premises (subject to BHG's rights in the Leasehold Interest) (the "*Purchase Price*") shall be the sum of (i) THIRTEEN MILLION TWO HUNDRED THOUSAND ($13,200,000.00) DOLLARS. Each of the following (the "*BHG Obligations*") shall remain the sole obligations of BHG under the terms of the Lease, and the Seller shall have no obligations in regard to any of the following: (i) any and all existing property taxes and (ii) all mechanics liens allowed by the Bankruptcy Court. The Purchase Price shall be paid by Purchaser on the Closing Date by wire transfer of immediately available federal funds to an account or accounts designated in writing by Seller.

3.    **BANKRUPTCY COURT MATTERS.**

3.1    **Sale Pursuant to Plan**.  Seller agrees that language that approves this Agreement and the consummation of the transactions hereunder shall be incorporated into the Confirmation Order and that the Plan shall conform with the applicable notice requirements necessary to consider approval of this Agreement as necessary under applicable rules, including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"). Seller shall seek inclusion of terms in the Confirmation Order that Seller's sale, transfer, assignment and conveyance of the Premises (subject to BHG's rights in the Leasehold Interest) shall be entitled to the protections afforded under Section 1146(a) of the Bankruptcy Code. In the event of any conflict between this Agreement and the Confirmation Order and Plan, the terms of the Confirmation Order and Plan shall prevail.

3.2    **Appeal of Confirmation Order**.  If, following the Closing, the Confirmation Order shall be appealed by any person (or a petition for certiorari or motion for rehearing, reconsideration or argument shall be filed with respect thereto), Seller and Purchaser, exclusively at their option and expense, may but are not obligated to, take all reasonable steps as may be necessary to defend against such appeal, petition or motion, and endeavor to obtain an expedited resolution of same. An appeal (or petition for certiorari or motion for rehearing, reconsideration or argument) of the Confirmation Order shall not delay or stay the Closing, except if and to the extent the Confirmation Order has been stayed by the Bankruptcy Court. Notwithstanding anything set forth herein to the contrary, Seller reserves the right to cancel this Agreement at any time if the Closing has not occurred by the date that is sixty (60) days after entry of the Confirmation Order.

4.    **CLOSING**.

4.1    **Closing Date.**  Subject to the satisfaction or waiver of all conditions precedent with respect to each Party's obligations hereunder, the closing (the "*Closing*") of the sale and purchase of the Premises and Leasehold Interest contemplated herein shall occur at the offices of counsel to Seller, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036 on a day and at a time which is not more than sixty (60) days after the Bankruptcy Court enters the Confirmation Order (the "*Closing Date*"), TIME BEING OF THE ESSENCE, provided that such Closing Date may be extended once, by written notice to Purchaser of Purchaser's failure to close on the Closing Date (the "*Default Notice*"), to the date that is ten (10) days after delivery of such Default Notice (the "*Final Closing Date*"), such Final Closing Date being a **final** time of the essence closing date. In the event the Closing does not occur on or before the Final Closing Date, this Agreement shall be deemed terminated.

5.    **TITLE MATTERS**.

5.1    **Condition to Title.**  The Premises shall be sold, conveyed and assigned, and Purchaser shall purchase the Premises subject to: (i) the terms and conditions of the Confirmation Order; (ii) any and all existing property taxes; (iii) all allowed mechanics liens; (iv)

BHG's rights in the Leasehold Interest and  any of Seller's obligations under the Leasehold Interest; and (v) such title exceptions affecting the Premises and Leasehold Interest as the Title Company or any other reputable title insurance company licensed to do business in the State of New York shall, at regular rates, be willing to omit as exceptions to coverage, and those matters listed in Exhibit "A-1"  to this Agreement (collectively, the "*Permitted Exceptions*"). Seller and Purchaser hereby expressly agree that the state of title set forth above, in the Confirmation Order and on Exhibit "A-1" hereto, including the Permitted Exceptions, reflect good, marketable, insurable and acceptable title to the Premises and Leasehold Interest, to the extent the Title Company issues a title policy consistent with such standards.

### 6.      CONDITION OF THE PREMISES AND LEASEHOLD INTEREST.

**(a)      Purchaser is a sophisticated investor and Purchaser's decision to purchase the Premises (subject to BHG's rights in the Leasehold Interest) is based upon its independent expert evaluations of such facts and materials deemed relevant to Purchaser and its agents.  In entering into this Agreement and consummating the transactions contemplated hereunder, Purchaser has not relied upon any oral or written information from Seller or any of Seller's agents, consultants, advisors or representatives, except for Seller's representations and warranties expressly set forth in this Agreement.  Without limiting the generality of the foregoing, except as otherwise expressly set forth in this Agreement, PURCHASER ACKNOWLEDGES AND AGREES WITH SELLER THAT PURCHASER IS PURCHASING THE PREMISES (SUBJECT TO BHG'S RIGHTS IN THE LEASEHOLD INTEREST) PURSUANT TO THE TERMS OF THIS AGREEMENT AND IN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION ON THE EXECUTION DATE (SUBJECT TO THE TERMS OF SECTION (b) BELOW) AND ORDINARY WEAR AND TEAR FROM CONTRACT TO CLOSING, TOGETHER WITH ANY LATENT DEFECT OR NON-DISCOVERABLE DEFECT, SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER AND SELLER DISCLAIMS AND PURCHASER WAIVES, RELEASES AND DISCHARGES SELLER FROM ANY AND ALL WARRANTIES, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR AS TO ANY ENVIRONMENTAL MATTERS EXCEPT TO THE EXTENT EXPRESSLY OTHERWISE PROVIDED UNDER THIS AGREEMENT. Purchaser agrees that its covenants, agreements and obligations under this Agreement shall not be excused or affected by (i) the physical condition of the Premises or Leasehold Interest, the physical condition or operation of the improvements or personal property, or the fitness, merchantability or suitability of the Premises or Leasehold Interest for any use or purpose, (ii) the compliance or non-compliance with any laws, codes, ordinances, rules or regulations of any governmental authority, or by any violations thereof, (iii) the environmental condition of the Premises or Leasehold Interest or their compliance or non-compliance with any laws, code, ordinances, rules or regulations of any governmental authority relating to the presence, use, storage, handling or removal of any Hazardous Substances (defined below), (iv) engineering controls, institutional controls, environmental covenants and deed restrictions implemented to address the presence of Hazardous**

Substances and for the remediation of the Premises or Leasehold Interest to non-residential standards, (v) the current or future use of the Premises or Leasehold Interest, including, but not limited to Purchaser's intended uses of the Premises or Leasehold Interest, (vi) the current or future real estate tax liability, assessment or valuation of the Premises or Leasehold Interest, (vii) the availability or non-availability of any benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment or other benefits of any kind, (viii) the availability or unavailability of any licenses, permits, approvals or certificates which may be required in connection with the operation of the Premises or Leasehold Interest, (ix) the compliance or non-compliance of the Premises or Leasehold Interest, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Premises' or Leasehold Interest's non-compliance, if any, with any zoning ordinances, or (x) the actual or projected revenue and expenses of the Premises or Leasehold Interest except as otherwise expressly provided in this Agreement. Seller is not liable or bound in any manner by any oral or written statements, representations, real estate brokers, "set-ups," offering memoranda or information pertaining to the Premises or Leasehold Interest furnished by any real estate broker, advisor, consultant, agent, employee, representative or other person. For the purposes of this Agreement, "Hazardous Substances" means: (w) those substances included within the definitions of any one or more of the terms "hazardous substances," "hazardous materials," "toxic substances," and "hazardous waste" in the Comprehensive Environmental, Response, Compensation and Liability Act, as amended, 42 U.S.C. §§9601 and 9657 et seq., the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §6901 et seq., and the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Sections 1801 et seq. and in the regulations promulgated pursuant to such laws; and (x) such other substances, materials and wastes as are regulated under applicable environmental laws or which are classified as hazardous or toxic under environmental laws; (y) any materials, wastes or substances that are (1) petroleum or in whole or in part derived from petroleum; (2) asbestos or asbestos-containing materials; (3) polychlorinated biphenyls; (4) designed as a "hazardous substance" pursuant to section 311 of the Clean Water Act, as amended, 13 U.S.C. §1321 et seq. (33 U.S.C. §1321) (the "*Clean Water Act*") or designated as "toxic pollutants" pursuant to §307 of the Clean Water Act (33 U.S.C. §1317); (5) flammable explosives; or (6) radioactive materials; and (z) degradation products of any of the foregoing. Nevertheless, the Parties agree that documents actually provided by Seller or its agents to Purchaser are true and complete copies. Notwithstanding anything to the contrary herein, Purchaser agrees that it shall be solely responsible for any damages, claims or liabilities with respect to the Leasehold Interest and hereby indemnifies and holds Seller harmless for any such damages, claims or liabilities.

## 7.   ACCESS FOR INSPECTIONS.

7.1   Purchaser reserves the right to request access to the Premises from time to time and at any time prior to Closing for the purpose of inspecting the Premises upon not less than three (3) Business Days' prior written notice to Seller. All access taken by Purchaser pursuant to the provisions of this Section 7 shall be at Purchaser's sole cost and expense and in accordance with all the laws, rules and regulations applicable thereto and subject to the terms and

conditions of this Agreement. Purchaser hereby agrees to indemnify and hold Seller harmless from any and all Liens, loss, damage, penalties, liabilities or claims arising from Purchaser's exercise of the rights herein granted, including, but not limited to attorney's fees and costs.

       7.2     The rights granted here shall be at Purchaser's sole risk. Seller shall owe no duty, whatsoever, to anyone utilizing such access to either warn or protect against any risk or hazard whether or not any Seller has actual or constructive knowledge of same. During such access, the foregoing personnel shall not cause any interference with any occupant or damage to the Premises. Seller may require that persons granted access be accompanied by Seller's representatives.

### 8.    REPRESENTATIONS.

       Seller and Purchaser do hereby represent and warrant to the other as follows, which representations and warranties shall be true and correct as of the Date of this Agreement and as of the Closing Date:

       8.1    **Validity**. This Agreement, once approved by the Bankruptcy Court, constitutes a valid and binding obligation of Seller and Purchaser in accordance with its terms.

       8.2    **Authority**. Subject to Bankruptcy Court approval, Seller and Purchaser have the full right and authority to execute this Agreement and fulfil all of the transactions hereby contemplated, subject to the terms and conditions of the Agreement.

       8.3    **Purchaser Identity**. Purchaser is Lazar Waldman, an individual with an address of 311 Roebling Street, Brooklyn, NY.

### 9.    CONDITIONS TO CLOSING.

       9.1    **Purchaser's Condition.** The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the performance and observance by Seller of all covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date and (ii) the fulfillment on or before the Closing Date of all other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any or all of which may be waived in writing by Purchaser in its sole discretion.

       9.2    **Seller's Condition**. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the satisfaction of the Leasehold Mortgage, (ii) the satisfaction of the BHG Obligations, (iii) the performance and observance by Purchaser of all material covenants and agreements of this Agreement to be performed or observed by Purchaser prior to or on the Closing Date and (iv) the fulfillment on or before the Closing Date of all conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in writing in its sole discretion.

### 10.    ITEMS TO BE DELIVERED AT CLOSING.

      **10.1**   **Seller's Deliveries**.   At Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by the Seller party thereto, as appropriate:

      (a)    A bargain and sale with covenants against grantor's acts deed with respect to the Premises (the "*Deed*") attached hereto and made a part hereof as <u>Exhibit B</u>.

      (b)    A copy of the Lease.

      (c)    Sole and exclusive possession of the Premises and Leasehold Interest, free of any other tenancies and any other rights of possession, together with all permanent fixtures and installations at the Premises (as included in the Purchase Price), and otherwise in vacant, and broom clean condition, with all non-permanent installations.

      (c)    such documents in such form as may be reasonably required by the Title Company, including, but not limited to, an Affidavit of Non-Foreign Status (FIRPTA).

      (d)    A copy of the Confirmation Order.

      (e)    Such further instruments, agreements or other documents as may be necessary to effectuate the provisions of this Agreement and expressed intent of the Parties as identified by the Title Company, the Bankruptcy Court and the Parties.

      **10.2**   **Purchaser's Deliveries**. At Closing, Purchaser shall deliver or cause to be delivered to Seller such further instruments, agreements or other documents as may be necessary to effectuate the provisions of this Agreement and expressed intent of the Parties as identified by the Title Company, the Bankruptcy Court and the Parties.

    **11.**   **CLOSING COSTS.**

      **11.1**   **Closing Costs**. Seller shall seek inclusion of terms in the Confirmation Order that (a) Seller's sale, transfer, assignment and conveyance of the Premises (subject to BHG's rights in the Leasehold Interest) and other assets transferred hereunder to Purchaser shall be entitled to the protections afforded under Section 1146(a) of the Bankruptcy Code, and (b) directing the clerk of the county in which the Premises is located to accept for recording all instruments delivered in connection with the Closing of the transactions contemplated under this Agreement without the imposition, levying or collection of conveyance, stamp, recording or any similar or related kind of taxes, assessment or required payment of any kind. If such a provision is not included, the Parties shall prepare and cause to be filed transfer tax returns indicating exemption by reason of the conveyance being pursuant to the Confirmation Order.

    **12.**   **ADDITIONAL AGREEMENTS.**

      Purchaser and Seller represent and agree as follows:

**12.1    Condemnation.** Seller shall provide to Purchaser copies of any notices of Condemnation received by Seller, within seven (7) days of receipt of same. In the event that any material portion of the Premises shall be taken in condemnation or under the right of eminent domain after the Date of this Agreement and before the Closing Date, Purchaser may at its option, either (i) terminate this Agreement or (ii) proceed to Closing under this Agreement and pay the full Purchase Price, in which latter event, all awards or settlements under any such proceedings, whether or not made prior to Closing, shall become the right and property of Purchaser.  Seller or its designees shall assign to Purchaser any claim or interest therein, and Seller or its designees hereby agree to execute any documents reasonably required by Purchaser in connection therewith after the Closing.  In the event Purchaser terminates this Agreement hereunder, this Agreement shall have no further force or effect, whatsoever, except for obligations of Purchaser which have previously accrued hereunder.

**12.2.    Cooperation.** Seller and Purchaser shall, from time to time, and at Closing, execute and deliver such further instruments as Purchaser or Seller or its counsel or Title Company may reasonably request or require to effectuate the intent of this Agreement and shall otherwise cooperate with each other in furtherance of the purposes of this Agreement.

## 13.    REMEDIES; TERMINATION.

**13.1**    In the event that (i) Purchaser violates or fails to fulfill or perform any of the terms and conditions of this Agreement required to be performed by Purchaser prior to Closing; or (ii) Purchaser fails to provide commercially acceptable proof of financing of the Purchase Price to the Seller on or before June 5, 2023; or (iii) Purchaser fails to consummate the acquisition of the Premises and Leasehold Interest as required hereunder on or before the Final Closing Date, in any such event, Seller may terminate this Agreement upon written notice to the Purchaser, whereupon this Agreement shall become null and void, and no Party shall have any further rights or obligations hereunder, except for such obligations as expressly survive the termination of this Agreement.

**13.2**    Purchaser's obligations hereunder are not subject to any financing contingency.  Purchaser may not delay the Final Closing Date or terminate this Agreement due to Purchaser's inability to obtain financing.

**13.3**    Notwithstanding anything to the contrary set forth in this Agreement, in no event shall Seller be liable to Purchaser or to any representatives, agents, affiliates or subsidiaries of Purchaser, for any special, exemplary, indirect or consequential damages, including without limitation any lost profits, loss of business, business interruption, lost savings or other incidental or punitive damages, even if Seller have been advised of the possibility of such damages. Under no circumstances shall the members, directors, officers or managers of Seller have any liability to Purchaser hereunder.

## 14.    NOTICES.

No notice, request, consent, approval, waiver or any communications under this Agreement shall be effective unless received, but any such communication shall be deemed to have been given upon receipt of same, if the same is in writing and is sent by hand courier,

recognized overnight delivery service, facsimile (followed by postage prepaid regular mail), email (followed by postage prepaid regular mail), or mailed by registered or certified mail return receipt requested, postage prepaid, addressed to the Parties at the addresses noted herein below. Copies of all notices shall be provided to each Party and the attorney for each Party, as applicable, at the respective addresses also noted below:

SELLER:                                    1325 Atlantic Realty LLC
                                           Attn: Esther Green-Blumenfeld
                                           404 Arlington Ave.
                                           Lakewood, NJ 08701
                                           Email:  esther@zolexgroup.com

ADDITIONAL NOTICE TO SELLER:               Klestadt Winters Jureller Southard
                                           & Stevens, LLP
                                           200 W. 41st Street, 17th. Fl.
                                           New York, New York 10036
                                           Attn: Tracy L. Klestadt
                                           Email: tklestadt@klestadt.com

PURCHASER:                                 Lazar Waldman
                                           311 Roebling Street,
                                           Brooklyn, NY  11211
                                           Email: lw@lwdevelopers.com

ADDITIONAL NOTICE TO PURCHASER:            Goldberg Weprin Finkel Goldstein LLP
                                           125 Park Ave., 12th Fl.
                                           New York, New York 10017
                                           Attn:  Kevin Nash
                                           Email:  knash@gwfglaw.com

## 15.    **APPLICABLE LAW; LIMITED RIGHT OF ASSIGNMENT BY PURCHASER.**

(a)     This Agreement and the performance hereof shall be governed, interpreted, construed and regulated by the laws of the State of New York.

(b)     The rights of Purchaser under this Agreement shall not be assigned by Purchaser without the prior written consent of Seller.

(c)     Any prohibited assignment of Purchaser's rights under this Agreement shall be deemed a breach of this Agreement entitling Seller, at its option, to terminate this Agreement, on notice to Purchaser.  In that instance, this Agreement shall have no further force or effect, whatsoever, except for those obligations of Purchaser that have previously accrued hereunder.

## 16.    **SEVERABILITY.**

If any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstance shall at any time and to any extent be found invalid or unenforceable, the remainder of this Agreement or the application of such terms and provisions to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Agreement shall be valid and deemed enforceable to the full extent permitted by law.

## 17. INTERPRETATION.

Wherever herein the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. This Agreement may be executed in original or PDF form in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

## 18. SECTION HEADINGS.

The section headings in this Agreement are inserted as a matter of convenience for reference and are not to be given any effect whatsoever in construing any provision of this Agreement.

## 19. ENTIRE AGREEMENT.

Except as set forth in the BHG Settlement Agreement, this Agreement sets forth all of the promises, agreements, conditions and understandings between the parties hereto under the subject matter throughout, and there are no promises, agreements, conditions or understandings, either written or oral, either expressed or implied, between them other than as set forth herein and therein. Except as herein otherwise specifically provided, no subsequent alterations, amendments, changes or additions to this Agreement shall be binding upon either Party unless agreed to in writing and signed by each Party.

## 20. RECORDING OF AGREEMENT OR MEMORANDUM PROHIBITED.

Purchaser agrees not to record this Agreement or any memorandum of this Agreement. If Purchaser breaches its promise, Seller may declare this Agreement in default and terminate same as provided herein. In that event, this Agreement shall have no further force or effect, whatsoever, except for those obligations of Purchaser that have previously accrued hereunder.

## 21. PRESENTATION OF THIS AGREEMENT.

This Agreement shall be considered only as an offer to Purchaser and shall not be enforceable against Seller until the same and all of its terms and conditions are approved by Seller and the Bankruptcy Court on notice to all creditors and this Agreement is executed and delivered by and on behalf of Seller.

## 22. NO PRESS RELEASES.

No press release or public statement concerning the transactions contemplated by this Agreement shall be made by any Party without the prior written approval of the others, which consent may be withheld by the other Party in its sole discretion.  Purchaser acknowledges that the existence of, and the terms and provisions of this Agreement and the information provided to Purchaser by Seller or otherwise obtained by Purchaser in the conduct of any investigations in connection with the transactions contemplated by this Agreement (including, but not limited to, information and material furnished to Purchaser prior to the date hereof), is confidential and proprietary to the Seller and shall be maintained in the strictest of confidence by Purchaser, provided that Purchaser may disclose such matters (i) as may be required, on advice of counsel, pursuant to applicable law or court order after giving Seller prior written notice of Purchaser's intention to disclose such matters and giving Seller a reasonable opportunity to seek a protective order or other relief; and (ii) to Purchaser's  financial advisers and attorneys in connection with the transactions contemplated by this Agreement, provided such financial advisers agree in writing to hold such information in the strictest of confidence on terms not less onerous than the restrictions contained in this provision.

23.     **TIME OF THE ESSENCE.**  Time, wherever specified herein for satisfaction of conditions or performance of obligations by Purchaser and Seller, is of the essence of this Agreement.

24.     **COUNTERPARTS.**  This Agreement may be executed by original or PDF signatures in any number of counterparts, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.  The Parties agree that facsimile and PDF copy signatures shall have the same force and effect as original signatures.

25.     **1031 EXCHANGE.**  Seller may structure the sale of the Premises and Leasehold Interest so that it qualifies under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986, as amended (a "*Like-Kind Exchange*").  Purchaser agrees to cooperate with Seller by taking such actions as are reasonably required to effectuate such a Like-Kind Exchange, including but not limited to (i) the execution of any and all documents, either in customary form used by the 1031 Intermediary or, subject to the reasonable approval of Purchaser's counsel, as are requested in connection therewith; and (ii) the use of the 1031 Intermediary.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties hereto have hereunto set their hands and seals as of the date first above written.

**SELLER:**

**1325 ATLANTIC REALTY, LLC** a New York limited liability company

By: _____
Name: Esther Green-Blumenfeld
Title:   Authorized Signatory

**PURCHASER**:

**LAZAR WALDMAN**

By: _____

[SIGNATURE PAGE OF SALE AGREEMENT]

# EXHIBIT A

## LEGAL DESCRIPTION

### Parcel No. 1 (Lot 80):

All that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York bounded and described as follows:

BEGINNING at a point on the northerly side of Atlantic Avenue distant, 80 feet 2 inches easterly from the corner formed by the intersection of the northerly side of Atlantic Avenue and the easterly side of New York Avenue;

RUNNING THENCE northerly and parallel with New York Avenue, 24 feet 6 inches; THENCE easterly parallel with Atlantic Avenue 19 feet 10 inches;

THENCE northerly again and parallel with New York Avenue, 99 feet 7 inches to a point is distance 100 feet easterly from the easterly side of New York Avenue and 210 feet 6 inches southerly from the southerly side of Herkimer Street;

THENCE easterly again parallel with Atlantic Avenue, 100 feet;

THENCE southerly again parallel with New York Avenue, 124 feet 1 inch to the northerly side of Atlantic Avenue; and

THENCE westerly along the northerly side of Atlantic Avenue, 119 feet 10 inches to the point or place of BEGINNING.

### Parcel No. 2 (Lot 77):

All that certain plot, piece or parcel of-land situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York bounded and described as follows:

BEGINNING at a point on the northerly side of Atlantic Avenue distant, 200 feet easterly from the corner formed by the intersection of the northerly side of Atlantic Avenue with the easterly side of New York Avenue;

RUNNING. THENCE northerly parallel with New York Avenue, 149 feet 1 inch; THENCE easterly parallel with Atlantic Avenue, 50 feet;

THENCE southerly parallel with New York Avenue, 149 feet 1 inch to the northerly side of Atlantic Avenue; and

THENCE westerly along the northerly side of Atlantic Avenue, 50 feet to the point or place of BEGINNING.

NOTE: Being Block(s) 1868, Lot(s) 80, 77, Tax Map of the Borough of Brooklyn, County of Kings.

NOTE: Lot and Block shown for informational purposes only.

**EXHIBIT A-1**

**PERMITTED EXCEPTIONS**

# EXHIBIT B

# BARGAIN AND SALE WITH COVENANTS DEED